UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

TAMMI ELDRIDGE et al.,

                Plaintiffs,

      -v-                                       No.  10 Civ. 0423 (LTS)

SUPERINTENDENT E. WILLIAMS et al.,

                Defendants.

---------------------------------------------------------x

## Memorandum Opinion and Order

Pro se plaintiffs Tammi Eldridge, Joyce Powell, Jazmin Shelton, and Sharon Mabry ("Plaintiffs"), all of whom are current or former inmates of Bedford Hills Correctional Facility ("BHCF"), bring this action, pursuant to 42 U.S.C. § 1983, against eight current or former New York State Department of Corrections and Community Supervision ("DOCCS") employees – Superintendent E. Williams, Deputy M. Capra, Deputy J. Hayden, Deputy M. Brynes, Deputy L. Zwillinger, Captain J. Fitzgerald, Captain L. Hammond, and Corrections Officer K. Davoren (collectively, "Defendants") – in their individual capacities.[1]  Plaintiffs allege that Defendants were deliberately indifferent to serious health risks that were inflicted on Plaintiffs through exposure to unreasonably high levels of environmental tobacco smoke ("ETS") due to inadequate enforcement of BHCF's indoor smoking ban.  Plaintiffs assert that Defendants' deliberate indifference to violations of the ban violated their right under the Eighth Amendment to the Constitution of the United States to be free from cruel and unusual punishment.  Plaintiffs also allege that Defendants violated New York state law through

---

[1]    Plaintiffs' claims against Defendants in their official capacities were previously dismissed by the Court. (See docket entry no. 39.)

inadequate enforcement of the New York State Clean Indoor Air Act and the DOCCS Indoor Smoke-Free Policy.  Plaintiffs purport to sue on behalf of themselves and all others similarly situated.  All of the Plaintiffs seek compensatory and punitive damages, and Eldridge, Powell, and Shelton seek declaratory and injunctive relief as well.[2]

Currently pending before the Court is Defendants' motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint.  The Court has jurisdiction of Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1367.  The Court has reviewed carefully all of the parties' submissions.  For the following reasons, the Court grants the motion in its entirety.

BACKGROUND

The following facts are drawn from the parties' submissions and are undisputed unless otherwise indicated.[3]  Plaintiffs Tammi Eldridge and Joyce Powell are current inmates at Bedford Hills Correctional Facility, and Plaintiffs Jazmin Shelton and Sharon Mabry were inmates there until June 2011 and June 2010, respectively.  (Def. 56.1 St. ¶¶ 2-5; Pl. 56.1 St. ¶ 2.)  Although Plaintiffs allege that most of BHCF's inmates smoke and generally do so throughout the facility, they allege that they suffered unreasonably high exposure to ETS in two areas of the facility's housing unit in particular: their individual cells, in which they allege that they were continuously exposed to smoke through the ventilation system, and the shower areas.

---

[2]     Plaintiff Mabry's claims for declaratory and injunctive relief were previously dismissed by the Court. (See docket entry no. 39.)

[3]     Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

(Def. 56.1 St. ¶¶ 27-28, 41-42, 53, 81; Pl. 56.1 St. ¶¶ 3, 15, 24, 41, 57.)  The units in which Plaintiffs are or were (before their release) housed consist of single-cell units with windows that can be opened, doors that are solid except for openings along the perimeters, and air vents.  (Def. 56.1 St. ¶¶ 15, 110; Pl. 56.1 St. ¶¶ 3, 61.)  Defendants deny that smoke constantly enters through vents in the cells.  Instead, Defendants assert that the ventilation system should filter out such smoke before it enters another cell, that smoke detectors should be triggered by in-cell smoking and that, to the extent that inmates take measures to conceal their in-cell smoking from detection by the smoke detector (such as by smoking at a window or over a flushing toilet), the measures would tend to reduce or eliminate the migration of ETS to other cells.  (Def. 56.1 St. ¶¶ 106-08.) Plaintiffs contend that smoke detectors generally have not been sensitive enough for smoking to activate them.  (Pl. 56.1 St. ¶ 59.)

Since 2001, the Department of Corrections and Community Supervision ("DOCCS") has had in effect an internal policy banning indoor smoking in correctional facilities.  (Id. ¶ 16.)  Violations of this policy are required to be treated as disciplinary infractions, leading prison officials to issue misbehavior reports initiating disciplinary proceedings.  Penalties for such violations range in severity based on the offense, with Tier I disciplinary proceedings involving the least severe infractions and punishments, and Tier III involving the most severe.  (Id. ¶ 103.)  Tier II and Tier III proceedings regarding smoking policy violations[4] declined from 63 charges (50 guilty findings) in 2008 to 21 charges (17 guilty findings) in 2012.  (Id. ¶ 105.)  Smoking in outdoor areas is not banned, and inmates are allowed to possess tobacco products and lighters in their cells.  (Kap. Decl. ¶ 29.)

---

[4]      Statistics for Tier I disciplinary proceedings are not tracked.  (Def. 56.1 St. ¶ 105.)

Other approaches that prison officials have used to enforce the indoor smoking ban include giving oral warnings, instead of issuing misbehavior reports, to inmates not known to have a history of violating the ban.  (Id. ¶¶ 103-04.)  Defendants also assert that they have the option of curtailing inmate privileges for an entire housing unit to address smoking violations when officers have found that identifying and punishing specific violators is otherwise impossible, but note that this form of punishment has rarely been necessary.  (Id. ¶ 111.)  Inmates' complaints about specific individuals and smoke detectors may further aid enforcement efforts.  (Id. ¶ 108.)

In 2007, Plaintiff Powell made a written complaint to former Superintendent Ada Perez, complaining that her unit had been "locked down" in response to unauthorized smoking, asserting that she should not have been punished for others' infractions, and requesting redesignation to a non-smoking unit.  (Fitz. Decl. ¶ 8.)  The letter was forwarded to Defendant Fitzgerald, who responded that the facility takes indoor smoking seriously and that a shutdown of common areas "has to be done to encourage all inmates to follow the rules."  (Id.)

Plaintiffs made multiple complaints about ETS and inadequate enforcement of the indoor smoking ban in the summer of 2009.  (Def. 56.1 St. ¶¶  29, 43, 54, 65, 86.)  In July 2009, Eldridge filed an inmate grievance about the response of Defendant Corrections Officer Davoren to an asthma attack that Eldridge had suffered and requested that prison officials enforce the indoor smoking ban in order to ensure a smoke-free environment.  (Schul. Decl., Exh. A at 10.)  Prison officials consolidated Eldridge's grievance with the other Plaintiffs' grievances that followed.  (Def. 56.1 St. ¶ 97.)  Plaintiffs generally complained of ETS exposure in the housing unit occurring in the shower area, as well as in their cells through the ventilation system such that they have even had to "tape" and "cover" up their vents to reduce exposure.  (Schul. Decl.,

Exh. A at 26-28, 33-35, 50.)  After an investigation by Sergeant Peperone, which concluded that while there was smoking, it "was not enough to be a problem," and that "the only way to stop secondhand smoke is to not allow tobacco at all," Defendant Superintendent Williams ultimately declined to institute new measures to enforce the indoor smoking ban as requested by Plaintiffs. (Def. 56.1 St. ¶¶ 98-99.)

In addition, Plaintiffs allege that they suffer from medical conditions that have been caused or exacerbated by ETS exposure.  Eldridge has suffered the most serious of the conditions as she has a history of asthma attacks and has had multiple inpatient stays in the infirmary.  (Def. 56.1 St. ¶¶ 49, 61, 67; Pl. 56.1 St. ¶ 21.)  The other Plaintiffs have had less serious medical episodes and have not required hospitalizations, although Mabry has been provided with emergency treatment for asthma.  (Pl. 56.1 St. ¶¶ 34-35.)  Mabry and Powell's asthma conditions have been usually characterized as "mild intermittent," the least severe of four possible assessment levels of asthma.  (Def. 56.1 St. ¶¶ 38, 73-74; Pl. 56.1 St. ¶¶ 14, 34-35.) Eldridge, Mabry, and Powell attribute their asthmatic conditions, and/or the exacerbation of those conditions, allergies, nasal and eye discomfort, and headaches, to ETS exposure.  (Def. 56.1 St. ¶¶ 23-24, 36, 49, 72;  Pl. 56.1 St. ¶¶ 9, 14, 21, 33-35.)  No diagnostic link between ETS and these conditions is recorded in the medical documentation that has been proffered in this motion practice, although the records reflect that Plaintiffs complained to medical personnel that their conditions had been triggered or exacerbated by ETS.  (Def. 56.1 St. ¶¶ 25, 37, 73, 75; Pl. 56.1 St. ¶¶ 9, 14, 21, 36.)  Furthermore, Mabry has testified that her respiratory illness has only had a "slight" impact on her daily activities, and there is no evidence that Mabry has developed a more serious medical condition since she left BHCF in June 2010.  (Def. 56.1 St. ¶¶ 75-76; Pl. 56.1 St. ¶¶ 36-37.)  Shelton does not suffer from asthma, but claims that the ETS to which she

was exposed exacerbated pre-existing allergies, causing problems such as difficulty in breathing and chest pains.  (Def. 56.1 St. ¶¶ 23-25; Pl. 56.1 St. ¶ 9.)  In May 2012, nearly a year after she left BHCF, Shelton testified that she has no physical health issues and has not been taking any prescribed medications.  (Def. 56.1 St. ¶ 34; Pl. 56.1 St. ¶ 13.)

<u>DISCUSSION</u>

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The moving party bears the burden of establishing that there is no genuine issue of material fact.  See Anderson, 477 U.S. at 256.  A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

In deciding a summary judgment motion, the Court must consider all of the admissible evidence, including affidavits, depositions, answers to interrogatories, and admissions on file, and "resolve all ambiguities and draw all factual inferences in favor of the nonmovant." See Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Moreover, the Court must generally afford "special solicitude" to pro se litigants.  Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Nevertheless, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which the party will bear the burden of proof at trial."  Celotex Corp.,

477 U.S. at 322.  The nonmoving party cannot defeat summary judgment "merely upon a 'metaphysical doubt' concerning the facts or on the basis of conjecture or surmise."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Section 1983 Claim

For Plaintiffs to prevail on a claim under 42 U.S.C. § 1983 against state prison officials in their individual capacities, two elements must be met: (1) the defendants must be acting under the color of state law, and (2) their actions must have deprived the plaintiffs of a right guaranteed by the Constitution or the laws of the United States.  Bryant, 923 F.2d at 983-84.  There is no dispute here about the first element – Defendants were state employees acting in their official capacities, and thus acting under color of state law.  The second element subsumes inquiries as to whether Defendants were personally involved in the alleged constitutional violation and the elements required to establish that the alleged violation occurred.  See Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)); see also, Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983").  Here, Plaintiffs claim that Defendants violated their rights under the Eighth Amendment to the Constitution through "deliberate indifference to a substantial risk of serious harm," that is, medical risks associated with exposure to ETS.

The Court will first consider whether the Plaintiffs have alleged facts sufficient to demonstrate that each of the Defendants was personally involved in the alleged deprivation of constitutional rights.

Personal Involvement

To establish supervisory liability under Section 1983, Plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Under Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995), a supervisory defendant can be found to be personally involved in a Section 1983 violation by showing any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[5]

A defendant's personal receipt of a complaint or letter and subjective awareness of the alleged unconstitutional conditions may be one factor that helps establish personal involvement. See Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("[i]f . . . the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved"). However, even if a complaint or letter is directly addressed to the defendant and the defendant becomes

---

[5]     While the Supreme Court in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), may have narrowed the viability of some of the Colon predicates for supervisory liability, the Court need not determine to what extent the Colon predicates survive here as none of the potentially narrowed predicates are at issue. See, e.g., Grullon v. City of New Haven, Docket No. 11-3184, 2013 WL 3023464, at *4 (2d Cir. Jun. 19, 2013) (the "requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" "may have [been] heightened").

subjectively aware of the alleged problem, if the defendant "lacks the authority to remedy or 'take action with respect to any constitutional violation,'" personal involvement "cannot be found." Kregler v. City of New York, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011) (quoting Kuolkina v. City of New York, 559 F. Supp. 2d 300, 317 (S.D.N.Y. 2008)); see, e.g., Denis v. N.Y.S. Dept. of Correctional Services, No. 05 Civ. 4495, 2006 WL 217926, at *21(S.D.N.Y. Jan. 30, 2006), report and recommendation adopted by, 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (granting summary judgment for the Chief Medical Officer of the correctional facilities due to lack of personal involvement because, while he may have received a complaint, he did not participate in the formulation, approval, implementation, or enforcement of the facilities' smoking policy and thus did not participate in the alleged deprivation). Moreover, if a supervisor merely received information of unconstitutional acts but reasonably acted upon it such as by "forward[ing] [a complaint] to [a] subordinate for investigation and response," that does not establish personal involvement under Colon. Grullon, 2013 WL 3023464, at *5 (quoting Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997)).

### Defendants Zwillinger, Hayden, and Capra

Defendants Zwillinger, the Deputy Superintendent for Administration, and Hayden, the Deputy Superintendent for Programming, both received copies of Plaintiffs' complaints about ETS exposure addressed either to others or directly to them. Defendants have testified, however, that remedying complaints about the enforcement of the smoking prohibition in the housing units is not within their authority. (Def. 56.1 St. ¶¶ 44, 59, 91, 101.) Zwillinger and Hayden have authority only over administrative matters and the program buildings, respectively. (Id.) Plaintiff Mabry also claims to have raised her request that security place female

"rover" corrections officers in the shower area directly with Defendant Zwillinger, but he similarly does not have the authority to address security matters.  (Id. ¶ 91.)  Although Plaintiffs assert that "it is within each one of [these defendants'] supervisory capabilities to implement policies to stop or minimize the violation," they do not cite any evidence in the record to support their claim.  (Pl. 56.1 St. ¶ 53.)  Because Defendants Zwillinger and Hayden lacked the authority to remedy the alleged ETS problem and they acted reasonably upon receipt of information alleging unconstitutional acts, they do not have the requisite personal involvement for Section 1983 liability.  See Denis, 2006 WL 217926, at *21; see also Sealey, 116 F.3d at 51.

Deputy Superintendent for Security Capra supervised Defendants Captain Fitzgerald and Captain Hammond.  The extent of his involvement appears limited to receiving of copies of complaints addressed to others, which, without more, is, again, not enough to establish personal involvement.  (Pl. 56.1 St. ¶ 16.)  See Sealey, 116 F.3d at 51.  Section 1983 liability cannot be established by respondeat superior alone.  See Iqbal, 556 U.S. at 676.  Accordingly, the Court concludes that Defendants Zwillinger, Hayden, and Capra are entitled to summary judgment due to lack of personal involvement.

### *Defendant Byrnes*

Defendant Byrnes, the Deputy Superintendent for Health, also received copies of Plaintiffs' complaints about inadequate enforcement of the indoor smoking ban and referred the matter to other prison officials.  However, although Plaintiffs assert otherwise, like Zwillinger and Hayden, Byrnes lacked the authority to enforce the indoor smoking ban in the housing units.  (Def. 56.1 St. ¶¶ 68, 101; Pl. 56.1 St. ¶ 53.)

Defendants acknowledge, however, that Byrnes did have the authority to remedy the alleged wrong with respect to Eldridge, who had written a letter to Byrnes asserting that doctors "threatened" to place her in the Regional Medical Unit (RMU) because of her asthmatic condition, in order to provide her with a smoke-free environment. (Def. 56.1 St. ¶ 67.) Byrnes responded to Eldridge's letter but allegedly failed to subsequently ensure that Eldridge would be able to live in a smoke-free environment. (Id.) The Court finds that there is sufficient evidence to establish Byrnes' personal involvement with regards to Eldridge's claims.

### *Defendants Davoren, Williams, Fitzgerald, and Hammond*

Defendants do not dispute that the remaining Defendants – Davoren, who worked as a corrections officer in the housing unit, Williams, who was superintendent until 2009, and Captains Fitzgerald and Hammond, who worked in security – were personally involved in the enforcement of the DOCCS smoking policy in the housing units.

### Deliberate Indifference Claims Against the Remaining Defendants: Byrnes, Davoren, Williams, Fitzgerald and Hammond

Plaintiffs allege that these Defendants deprived them of their Eighth Amendment right to be free from cruel and unusual punishment by being deliberately indifferent in inadequately enforcing the indoor smoking ban, thereby exposing them to unreasonably high amounts of ETS. To show that a prison official has violated the Eighth Amendment through deliberate indifference, a plaintiff must demonstrate that: (1) the conditions of confinement objectively posed a "substantial risk of serious harm," and (2) the defendant was subjectively aware of and unreasonably disregarded this health or safety risk. Helling v. McKinney, 509 U.S. 25, 33-35 (1993); Farmer v. Brennan, 511 U.S. 825, 839 (1994).

*Objective Prong: Substantial Risk of Serious Harm*

Plaintiffs may satisfy the objective prong of a deliberate indifference claim by demonstrating that ETS exposure is causing them to suffer, or is exacerbating their suffering from, "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway v. Coughlin, 37 F.3d 63, 66 (internal quotation marks and citation omitted); see also Denis, 2006 WL 217926, at *13; Koel v. Bernstein, No. 10 Civ. 3808, 2011 WL 2436817, at *20 (S.D.N.Y. Jun. 17, 2011), report and recommendation adopted by, 2011 WL 4390007 (S.D.N.Y. Sep. 21, 2011).

The Supreme Court has recognized that, even without a demonstration of contemporaneous harm, an inmate may satisfy the objective prong by offering proof that she herself "is being exposed to unreasonably high levels of ETS" that "pose an unreasonable risk of serious damage to [her] future health." Helling, 509 U.S. at 35.  While the Helling Court did not specify a threshold level or degree of immediacy of such an unreasonable risk, its illustrations involving "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," the viability of a complaint about "demonstrably unsafe drinking water without waiting for an attack of dysentery," and the impropriety of "deliberate indifferen[ce] to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms" suggest that the risk, type, and likely immediacy of harm must be serious and non-speculative.  Id., at 33. The Court further made it clear that a determination of whether the challenged

> conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner

> complains of to be so grave that it violates contemporary standards of decency to
> expose anyone unwillingly to such a risk. In other words, the prisoner must show
> that the risk of which he complains is not one that today's society chooses to
> tolerate.

Id., at 36.  Noting that the complaining prisoner, who had originally been double-bunked with a

five-pack-a-day smoker, had been transferred to a prison that had recently instituted a policy

restricting smoking in certain program areas, the Court in Helling observed that "it is possible

that the new policy will be administered in a way that will minimize the risk to [the complainant]

and make it impossible for him to prove that he will be exposed to unreasonable risk with respect

to his future health."  Id.; see also Lee v. Taylor, 327 F. App'x 253, 254 (2d Cir. 2009) ("[A]

plaintiff 'states a cause of action under the Eighth Amendment by alleging that prison officials

have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk

of serious damage to his future health'"); Shepherd v. Hogan, 181 F. App'x 93, 95 (2d Cir. 2006)

(noting that while the plaintiff "also alleged that he had experienced a number of medical

problems as a result of his ETS exposure . . . this allegation was not necessary for him to prevail

[because a] future risk can suffice to constitute a substantial risk of serious harm, even if an

inmate experiences no present symptoms").

To prevail on their claim of deliberate indifference to unreasonable future risk

associated with ETS exposure, Plaintiffs must demonstrate that their exposure poses a risk that

"is not one that today's society chooses to tolerate." Zaire v. Artuz, No. 99 Civ. 9817, 2003 WL

230868, at *4 (S.D.N.Y. Feb. 3, 2003) (quoting Helling, 509 U.S. at 35-36).  Because "the

Constitution does not mandate comfortable prisons," some exposure to ETS does not necessarily

violate the Constitution.  Rhodes v. Chapman, 452 U.S. 337, 349 (holding that housing two

inmates in a single cell did not violate the Constitution); Scott v. Dist. of Columbia, 139 F.3d

940, 942 (D.C. Cir. 1998) ("Helling did not read the Eighth Amendment as mandating smoke-free prisons").

Courts have generally found ETS exposure to be unreasonably high mainly when the plaintiff shares a cell with an inmate who is a frequent or chain smoker, or when the plaintiff is housed in a cell surrounded by such smokers.  See, e.g., Helling, 509 U.S. at 35-36 (living with a cellmate who smokes five packs of cigarettes a day may satisfy the objective prong); see also Davis, 316 F.3d at 100 (plaintiff's experience in having a cellmate who smoked and being housed in areas where he was surrounded by smokers, such that "the smell of smoke fills the air and enter[s] my cell in a manner as though I was myself smoking," may satisfy the objective prong).  The Second Circuit has also upheld the sufficiency of a claim of ETS exposure as an unreasonable risk to future health when a plaintiff was housed in close quarters with a chain smoker for more than a month, even if the plaintiff often left his cell during the day.  Shepherd, 181 F. App'x at 95.

On the other hand, courts in this Circuit have generally found ETS exposure to be insufficiently high when the exposure was limited to common areas outside of immediate living quarters, such as recreational areas where a plaintiff is only temporarily and/or voluntarily exposed to ETS.  See Zaire, 2003 WL 230868, at *5 (ETS was not unreasonably high where the plaintiff was exposed to it only in common areas like the gymnasium and he visited it only three times a week while his cell was smoke-free); see also Gill v. Bracey, No. 99 Civ. 10429, 2001 WL 34045758, at *2, *4 (S.D.N.Y. Jul. 17, 2001) (ETS was not unreasonably high where the plaintiff was exposed to the ETS for four and a half hours a day while in the law library and in line at the medical dispensary and he was not exposed to ETS in his cell).

Here, if Plaintiffs' allegations are accepted as true, perceptible ETS exposure

occurred primarily in the shower area and in Plaintiffs' cells through the ventilation system, and to a lesser extent, through the spaces around the cell doors.  (Def. 56.1 St. ¶¶ 27-28, 41-42, 53, 81; Pl. 56.1 St. ¶¶ 3, 15, 24, 41, 57.)  The Plaintiffs have alluded to a 2007 Surgeon General's report that finds it impossible to identify a safe level of ETS and have referenced academic articles regarding ETS exposure risks, but have not proffered any scientific evidence to indicate that the level of ETS to which they have been exposed is unreasonable under the Helling standard in the context of general health risks.  The recent decision in Islam v. Connolly is instructive.  No. 07 Civ. 3225, 2011 WL 723568, at *6 (S.D.N.Y. Feb. 16, 2011).  There, the court held that the plaintiff's exposure to ETS in the bathroom, which he visited twelve times daily for four or five minutes each time, was not unreasonably high.  Id.  Here, going to the shower area exposed Plaintiffs to ETS briefly, once a day.  Plaintiffs also had some control over when they showered and, according to Defendants' uncontroverted proffer, the ability to ask the officers on duty to clear the shower room of smokers if anyone was smoking.  (Def. 56.1 St. ¶ 121.)  Under these factual circumstances, Plaintiffs' allegations regarding the presence of smokers in the shower room and lingering smells on their hair, bodies, and clothing, are insufficient to frame a genuine issue of fact as to whether the failure to enforce completely the indoor smoking ban presented an objectively unreasonable risk to Plaintiffs' health within the meaning of Helling, much less that the situation was one to which *anyone's* involuntary exposure would "violate[] contemporary standards of decency."  See Helling, 509 U.S. at 36.

There is little case law in the Second Circuit on allegations involving cigarette smoke entering an inmate's cell through a ventilation system.  Enigwe v. Zenke, No. 03 Civ. 854, 2007 WL 2713849, at *4 (E.D.N.Y. Sept. 14, 2007) was one case in the Second Circuit where the plaintiff alleged not only that this cellmate chain-smoked, but also that cigarette

smoke entered his cell through the ventilation system for two months. The district court held that the plaintiff did not meet the objective prong in showing a substantial risk of serious harm.  The plaintiff, though, had contradicted his own allegations, admitting that he never saw anyone smoke inside the housing unit or in his cell and that he could not recall whether he ever actually saw smoke coming from any vents.  Id., at *4-5.

Here, Plaintiffs have been or were incarcerated at Bedford Hills and allege daily exposure to ETS in their cells for years.  (Def. 56.1 St. ¶¶ 2-5, 27, 60; Pl. 56.1 St. ¶¶ 15, 57.)  For example, Eldridge alleges that her cell has been "engulfed in smoke," and that she has awakened "out of her sleep to a smoke induced [sic] room, making her gasp for air, . . . wheeze and [have] pain in her chest."  (Compl. at 7.)  Likewise, Shelton alleges that smoke has entered her cell such that she "has been unable to sleep due to the smoking she is forced to inhale."  (Id. at 27; Def. 56.1 St. ¶ 27.)  Shelton furthermore estimated that roughly forty out of sixty inmates in her housing unit smoked, but she has not indicated how often they smoked indoors or how much of that smoke traveled into her cell through the ventilation system.  (Id. at 27.)  Plaintiffs also cite observations by another inmate, Audra Harris, who complained that she "smell[ed] smoke," and by Corrections Officer Alvarez, who "witnessed makeshift ashtrays," as evidence of widespread smoking in the housing units.  (Schul. Decl., Exh. A at 18, 34.)

Defendants contend that ETS exposure cannot be that high because the ventilation system "should" filter the smoke out of the air before it enters a cell and, as Eldridge testified, the prison installed a new ventilation system in 2009.  (Def. 56.1 St. ¶ 108; Eldridge Dep. at 47.) Defendants further argue that, if indoor smoking was as prevalent as Plaintiffs claim, the smoke detectors would set off alarms and prompt investigations frequently, noting that Plaintiffs have identified only one incident where an alarm sounded due to smoking.  (Def. 56.1 St. ¶ 108.)

Plaintiffs contend, though, that the smoke detectors are not sensitive enough to be activated by most smoking violations.  (Pl. 56.1 St. ¶ 59.)  Other evidence suggesting that ETS is not such a significant problem include the fact that no inmate has filed a grievance about ETS exposure since Plaintiffs last filed a grievance in 2009, and the American Correctional Association audits of BHCF in 2009 and 2012 did not mention any problems with ETS exposure.  (Def. 56.1 St. ¶¶ 115-16.)

Overall, even assuming Plaintiffs' evidence to be true, the constant smell of smoke, some smoke entering cells through the vents, and occasional instances of Plaintiffs' cells being "engulfed" in ETS do not amount to the level of unconstitutional ETS exposure that is comparable to living with a cellmate who is a frequent or chain smoker.  Furthermore, there is no constitutional right to be free from merely the smell of cigarette smoke and the Plaintiffs cite no evidence that exposure to the smell of cigarette smoke poses a substantial risk of serious harm to future health.  Accordingly, the Court finds that the evidence of general ETS exposure in Plaintiffs' cells through the ventilation system is insufficient to meet the objective prong of an Eighth Amendment claim.

The Court also considers whether Plaintiffs' specific medical injury claims sufficiently allege a serious medical condition that has been caused or aggravated by the influx of ETS into their cells.  Factors relevant to determining the seriousness of a medical condition include whether: (1) "a reasonable doctor or patient would find [it] important and worthy of comment," (2) it "significantly affects an individual's daily activities," and (3) it causes "chronic and substantial pain."  Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  Severe asthmatic conditions may be found sufficiently serious to meet the objective element, but courts have rejected medical conditions as

insufficiently serious where asthma was relatively mild, was not life-threatening, and did not require hospitalization, notwithstanding use of prescription medication and inhalers.  See Oliver v. Deen, 77 F.3d 156, 158-60 (7th Cir. 1996); see also Colon v. Drew, 335 F. App'x 86 (2d Cir. 2009).

Plaintiff Eldridge has a relatively severe asthmatic condition and alleges that, due to ETS exposure, she has had a history of asthma attacks requiring inpatient stays in the infirmary and has been awakened out of her sleep, "gasping for air."  (Def. 56.1 St. ¶¶ 49, 61, 67; Compl. at 10.)  Defendants contend that her conduct suggests that her injuries are not that serious and that a smoke-free environment would be unnecessary to ensure that she is protected against unreasonable risks arising from ETS exposure.  In particular, they contend that since April 2012, she has voluntarily worked in the asbestos removal program, for which she declared herself to be in good health, was medically cleared, and has had to take precautions to protect against the hazards of asbestos exposure.  (Id. ¶¶ 51, 113-14.)  Eldridge minimizes the importance of her volunteering for the asbestos removal program, though, contending that the program provides adequate protection and, as a result, does not exacerbate her asthma as ETS exposure does.  Overall, notwithstanding her participation in the asbestos removal program, Eldridge's medical records indicate hospitalizations and difficulty sleeping due to ETS exposure, which present a genuine issue of material fact for trial as to whether Eldridge has suffered from sufficiently serious injuries to meet the objective prong.  (Id. ¶¶ 49, 61, 67; Compl. at 10.)

In contrast, Plaintiffs Powell, Mabry, and Shelton, like the plaintiff in Oliver, have had less serious medical incidents that have not required hospitalizations.  77 F.3d at 158-60.  Their claimed injuries include asthmatic conditions usually assessed as "mild intermittent," or the least severe type of asthma, and/or symptoms such as headaches, irritated and watery eyes,

and breathing problems.  (Def. 56.1 St. ¶¶ 23-25, 38, 74.)  Mabry also has testified that her

medical condition has only had a "slight" impact on her daily activities.  (Def. 56.1 St. ¶¶ 75-76;

Pl. 56.1 St. ¶¶ 36-37.)  Shelton furthermore has testified that, as of May 2012, nearly a year after

she left BHCF, she has not had any physical health issues and has not been taking any prescribed

medications.  (Def. 56.1 St. ¶ 34; Pl. 56.1 St. ¶ 13.)  These medical conditions, although clearly

ones that have caused Plaintiffs discomfort and worry, do not rise to the level of seriousness as

required to violate the Eighth Amendment.  <u>See</u>, <u>e.g.</u>, <u>Gill v. Bracey</u>, 99 Civ. 10429, 2001 WL

34045758, at *4 (S.D.N.Y. July 17, 2001) (not sufficiently serious injury where plaintiff suffered

from a treatable infection and respiratory problem such as asthmatic bronchitis); <u>Johnson v.</u>

<u>Goord</u>, No. 01 Civ. 9587, 2005 WL 2811776, at *5-6 (S.D.N.Y. Oct. 27, 2005) (not sufficiently

serious injury where plaintiff suffered from "temporary discomfort" and was occasionally treated

for respiratory conditions); <u>Blyden v. Bartlett</u>, No. 95 Civ. 1071, 1997 WL 584308, at *2

(W.D.N.Y. Sept. 9, 1997) (not sufficiently serious injury where plaintiff suffered only from

headaches, irritability, and nausea and no medical records substantiated causation of or

aggravation of allergies due to ETS exposure).

        Accordingly, there is a genuine issue of material fact with respect to whether

Plaintiff Eldridge has suffered sufficiently serious medical injuries that have been caused or

aggravated by exposure to ETS, which precludes granting summary judgment against her.

However, the Court grants summary judgment against Plaintiffs Powell, Mabry, and Shelton and

dismisses all their claims against Defendants from this case for lack of a sufficiently serious risk

of medical harm.


### _Subjective Prong: Deliberate Indifference_

Deliberate indifference is a "state of mind that is the equivalent of criminal recklessness." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).  For their conduct to amount to an Eighth Amendment violation, Defendants must have knowingly and unreasonably disregarded an intolerable or excessive risk of harm to Plaintiffs.  Farmer, 511 U.S. 825, 839 (1994) (adopting a subjective test for deliberate indifference and holding that plaintiff prisoner did not necessarily have to provide advance notice of a concern for his safety to the defendants).  The alleged unconstitutional conduct must constitute "more than ordinary lack of due care for the prisoner's interests or safety," but the law does not require that the conduct be intended to cause harm.  Id., at 835.

Where a defendant has subjective knowledge of alleged unconstitutional conditions after reading a complaint but has taken reasonable steps to remedy the problem, a claim will fail for lack of deliberate indifference.  See Grullon at *6-7 (citing Sealey, 116 F.3d at 50-51)).  Also, mere imperfect enforcement of an indoor smoking ban in a prison, as long as reasonable enforcement efforts are made, does not amount to deliberate indifference.  See e.g., Scott, 139 F.3d at 944.

Because Plaintiffs Powell, Mabry, and Shelton's claims have been dismissed for failure to demonstrate that there is an objectively substantial risk of serious harm, the Court will consider evidence of deliberate indifference only with respect to Plaintiff Eldridge's specific medical needs.

### _Defendant Byrnes_

The basis for Plaintiff Eldridge's claim against Defendant Byrnes is a letter Eldridge wrote to Byrnes asserting that doctors "threatened" to place her in the Regional Medical Unit (RMU) because of her asthmatic condition in order to provide her with a smoke-free environment.  (Def. 56.1 St. ¶ 67.)  Defendants contend that Byrnes acted reasonably by replying that Eldridge could choose to accept or decline that placement offer, and that Eldridge willingly accepted ETS exposure in the housing unit by declining to be transferred to the RMU. (Id.)  However, Eldridge claims that the RMU is not actually smoke-free because inmates still smuggle in tobacco and smoke inside the facility.  (Eldridge Aff. Jul. 9, 2013.)  Nonetheless, there is no evidence in the record that Byrnes was aware of a problem with smoking in the RMU, especially as Eldridge's letter did not raise the issue, and thus there was no reason for Byrnes to believe that a transfer to the RMU would not have addressed Eldridge's medical needs.  (Schul. Decl., Exh. A at 15-16.)  Because the evidence is insufficient to establish that Byrnes was deliberately indifferent, the Court grants summary judgment and dismisses Eldridge's claim against Byrnes.

### Defendant Davoren

Plaintiffs allege that Corrections Officer Davoren was deliberately indifferent in inadequately enforcing the indoor smoking ban whenever she worked in the housing unit, emphasizing in particular one incident involving Eldridge.  (Def. 56.1 St. ¶ 64; Pl. 56.1 St. ¶ 28.) Eldridge claims that, on July 21, 2009, the ETS in her cell caused her to be unable to breathe and woke her up.  (Def. 56.1 St. ¶ 60.)  At the time, Davoren had gone to verbally admonish a neighboring inmate who had smoked and activated the smoke detector.  (Id.; Pl. 56.1 St. ¶ 26.)

Plaintiffs claim that Davoren's failure to issue a misbehavior report to that violator demonstrates her deliberate indifference.

Davoren did, however, respond to the smoke alarm by investigating and telling the inmate to stop smoking.  (Def. 56.1 St. ¶ 60; Pl. 56.1 St. ¶ 28.)  There is no evidence that Davoren knew of the smoking before the alarm went off.  More importantly, there is no evidence that Davoren, before the incident occurred, was subjectively aware of but still chose to disregard Eldridge's asthma and other medical conditions that allegedly made her more susceptible to harm when exposed to ETS.  To the contrary, Davoren immediately called for medical assistance upon finding out about Eldridge's difficulty with breathing.  (Def. 56.1 St. ¶¶ 61-62.)

Given the undisputed facts proffered by the Defendants, the Court concludes there is not sufficient evidence for a rational fact finder to conclude that Davoren was deliberately indifferent.  The Court therefore grants summary judgment as to Defendant Davoren and dismisses from this case all claims against her.

### *Defendants Williams, Fitzgerald, and Hammond*

As for the remaining Defendants' response to Plaintiff Eldridge's specific medical needs, there is no dispute that Williams, Fitzgerald, and Hammond have personal knowledge of Eldridge's serious asthmatic condition.  (Def. 56.1 St. ¶ 71.)  Eldridge admits, however, that BHCF medical personnel had offered her placement in the RMU to provide her with a smoke-free environment.  (Id. ¶ 67.)  Although Eldridge asserts she declined the offer due to the RMU not actually being smoke-free because inmates still smuggle in tobacco and smoke there, there is no evidence that prison officials were aware of a problem with smoking in the RMU.  (Eldridge Aff. Jul. 9, 2013.)  It would be reasonable to believe that the option of

transferring to the RMU would adequately address Eldridge's medical needs.

In addition, Defendants have provided evidence that there have been continued efforts to enforce the indoor smoking ban generally.  Defendants assert that complaints are investigated and violators either are issued misbehavior reports initiating formal disciplinary proceedings (typically for inmates who are "repeat" or "egregious" violators of the smoking ban), or are given oral warnings (usually for inmates who are not known to have a history of smoking violations).  (Def. 56.1 St. ¶¶ 103-05.)  Disciplinary proceedings for smoking violations declined from 63 charges (50 guilty findings) in 2008 to 21 charges (17 guilty findings) in 2012, for a population of roughly 750 inmates.  (Def. 56.1 St. ¶¶ 14, 105.)  Defendants argue that this decrease in the number of disciplinary proceedings over the years reflects fewer smoking violations.  While the Court finds that enforcement of the indoor smoking ban clearly has not been perfect, imperfect enforcement efforts do not amount to deliberate indifference to ETS exposure.  See, e.g., Scott, 139 F.3d at 944.

Defendants furthermore contend that their specific interactions with Eldridge do not demonstrate deliberate indifference.  Williams reviewed and decided Plaintiffs' consolidated grievance – including Eldridge's – which complained of ETS exposure and inadequate enforcement of the indoor smoking ban in general.  (Id. ¶ 97.)  In her formal response to the grievance, Williams indicated that the facility had a ban on indoor smoking that would continue to be enforced, but declined to introduce new enforcement measures that the Plaintiffs requested, including designated smoke breaks.  (Id. ¶ 99.)  Defendants argue that Williams reasonably relied on Sergeant Peperone's investigation to address the grievance, which found that "some inmates were smoking, but not enough to be a problem."  (Id. ¶ 98.)  As a supervisor, Williams may rely on findings by her subordinate, Sergeant Peperone, if "those decisions do not appear to

be obviously invalid, illegal or otherwise inadequate."  Poe v. Leonard, 282 F.3d 123, 144 (2d

Cir. 2002).  It would be administratively impractical for a supervisor to have to independently

investigate everything.  Id.  There does not appear to have been reason for Williams to have

disregarded Sergeant Peperone's findings.  The Court finds that Williams' denial of a grievance

based on a subordinate's investigation does not amount to deliberate indifference.

      Defendants Hammond and Fitzgerald met with Plaintiffs Eldridge and Mabry to

discuss and investigate their ETS exposure concerns.  Hammond allegedly responded that, if

Eldridge and Mabry declined to provide names of inmates violating the smoking ban, he could

not do anything to address the problem of smoking violations in the RMU.  (Def. 56.1 St. ¶ 46.)

Fitzgerald allegedly responded, "Are you kidding . . . I can't stop [inmates] from having sex in

the jail so how do you think I'm going to stop them from smoking[?]"  (Id. ¶ 92; Pl. 56.1 St. ¶

47; Schul. Decl., Exh. A at 33.)  Although Plaintiffs assert that these statements demonstrated

deliberate indifference, Defendants contend that they were reasonable responses that simply

recognized the difficulty of achieving full compliance with the indoor smoking ban.  The Court

finds that these statements are insufficient evidence for a rational fact finder to conclude that

Hammond and Fitzgerald were deliberately indifferent to Eldridge's serious medical needs.

      Because Eldridge was offered placement in a smoke-free environment, her

complaints were appropriately investigated and responded to, and there have been general efforts

to enforce the indoor smoking ban even though they may have been imperfect, the Court grants

summary judgment for the remaining Defendants, Williams, Fitzgerald, and Hammond, and

dismisses all claims against them for lack of evidence of deliberate indifference.

Qualified Immunity

Even if there were a triable question as to whether Defendants Byrnes, Davoren, Williams, Fitzgerald, and Hammond were deliberately indifferent to Eldridge's serious medical needs, Plaintiffs' claims against them may be dismissed on qualified immunity grounds. Defendants are entitled to qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate such law.  Warren v. Keane, 196 F.3d 330, 332 (2d Cir. 1999) (citing Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)).  Helling "clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health."  Keane at 333.  However, the Court finds that it was objectively reasonable for the Byrnes, Davoren, Williams, Fitzgerald, and Hammond to believe that their actions did not violate the law.  Again, undisputed evidence indicates that once Davoren found out about Eldridge's serious medical needs, she acted reasonably by immediately calling for assistance.  Williams, Fitzgerald, and Hammond appropriately investigated and addressed Eldridge's complaints of inadequate enforcement of the indoor smoking ban.  Finally, Byrnes reasonably responded to Eldridge's letter by informing her that she could accept or reject the offer of placement in the smoke-free RMU.  There is no evidence that any of the Defendants were aware of a smoking problem in the RMU that would have made the RMU inadequate for addressing Eldridge's serious medical needs.  Accordingly, the Court finds that claims against Defendants Byrnes, Davoren, Williams, Fitzgerald, and Hammond may be dismissed on qualified immunity grounds as well.

State Law Claims

Plaintiffs argue that the New York Correction Law Section 24, which provides immunity for corrections officers against any state law claims, violates the Supremacy Clause of the Constitution of the United States.  The statute provides that "[n]o civil action shall be brought in any court of the state . . . against any officer or employee of the [Department of Corrections and Community Supervision], . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee."  New York Correction Law § 24 (McKinney 2011).   However, because the law provides immunity only from state law claims and it does not purport to restrict any federal laws, the Supremacy Clause does not affect its validity.  Accordingly, pursuant to New York Correction Law Section 24, the Court dismisses all of Plaintiffs' state law claims.

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion for summary judgment in its entirety.[6]  Because the Court dismisses all claims, it does not consider arguments with respect to Plaintiffs' class action claims and Plaintiff Shelton's claims for declaratory and injunctive relief against Defendants.

This Memorandum Opinion and Order resolves docket entry number 70.  The Clerk of Court is hereby directed to enter judgment dismissing all of the named Plaintiffs' claims and close this case.

---

[6]   The Court has also thoroughly reviewed Plaintiffs' unauthorized surreply and concludes that it does not materially impact the Court's findings.

The Court certifies, pursuant to 28 U.S.C.§ 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated: New York, New York
        July 30, 2013

_____
                /S
LAURA TAYLOR SWAIN
United States District Judge

Copies mailed to:
Tammi Eldridge (#01-G-1123)
Bedford Hills Correctional Facility, P.O. Box 1000
Bedford Hills, NY 10507

Joyce Powell (#07-G-0632)
Bedford Hills Correctional Facility, P.O. Box 1000
Bedford Hills, NY 10507

Jazmin Shelton
550 Cauldwell Avenue, #156
Bronx, NY 10455

Sharon Mabry
(#00-G-0299)
Taconic Correctional Facility
250 Harris Road
Bedford Hills, NY 10507